

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1980 | **DATE** | 5/21/2002 |
| **CASE TITLE** | | Hinton vs. Snyder | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐   Filed motion of [ use listing in "Motion" box above.]

(2)  ☐   Brief in support of motion due _____.

(3)  ☐   Answer brief to motion due_____ . Reply to answer brief due_____.

(4)  ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐   Trial[set for/re-set for] on _____ at _____.

(8)  ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
        ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10)  ■   [Other docket entry]   Enter Memorandum Opinion and Order denying the petitioner's petition for a writ of habeas corpus. Any pending motion in this case is terminated as moot.

(11)  ■   [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices: 3

MAY 2 2 2002
date docketed

CDY
docketing deputy initials

5/21/2002
date mailed notice

MPJ
mailing deputy initials

**Document Number**

**36**

courtroom deputy's initials: MPJ

U.S. DISTRICT COURT

02 MAY 21 PM 4:35

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAY 22 2002

United States of America ex rel.          )
LEONARD HINTON,                           )
                                          )
                    Petitioner,           )
                                          )
          v.                              )     No. 00 C 1980
                                          )
DONALD SNYDER, Director,                  )
Department of Corrections,                )
State of Illinois,                        )
                                          )
                    Respondent.           )

## MEMORANDUM OPINION AND ORDER

Leonard Hinton was convicted of three counts of murder in Illinois state court and sentenced to life imprisonment. He petitions for a writ of habeas corpus under 28 U.S.C. § 2254. The respondent (hereinafter "the State") moved to dismiss Mr. Hinton's claims as procedurally barred. I granted the motion on all but one claim, that his confession was coerced, *see Hinton v. Snyder*, 128 F. Supp. 2d 1165 (N.D. Ill. 2001), which is before me now on the merits. Mr. Hinton seeks an evidentiary hearing to present new evidence related to his allegations of physical abuse.

I.

According to the allegations in his petition, Mr. Hinton was arrested on a warrant for an aggravated battery (unrelated to the murder charges here) and taken into custody at 5:00 p.m. on November 25, 1983. He was taken to the Area II Violent Crimes

Detective Unit of the Chicago Police Department ("Area II"), then under the command of Lieutenant Jon Burge. He was handcuffed to the wall of a small room with no windows or clocks and no furniture other than an iron bench. Supp. R. at 6-8. He remained in custody until approximately 3:30 p.m. on November 27, when he confessed to the murders of Dorothy McKnight and Edward Bradley and the shooting of John Durham.[1]

The State proceeded first and offered rebuttal testimony on Mr. Hinton's pretrial motion to suppress his statements. See R. at 2, 32, 101; Supp. R. 70-71. The State presented testimony from officers and a state's attorney who had contact with Mr. Hinton while he was in custody. Officer Bajenski, who arrested Mr. Hinton and interrogated him at Area II, testified that Mr. Hinton was allowed to use the washroom, R. at 38, 42, and that he did not observe any blood on Mr. Hinton's clothing on November 25th, the first night he was in custody, *id.* at 42. Officer Kripple,[2] who interrogated Mr. Hinton along with Officer Bajenski, testified that Mr. Hinton was fed on the morning of the 26th and on the 27th, *id.* at 54, 58, that he never complained about being struck, *id.* at 54, 61, that he remained in the interview room the whole time, *id.* at 57-58, and that he was not handcuffed for the whole time, *id.* at

---

[1] John Durham died as a result of his wounds four weeks later, though he was alive when Mr. Hinton was interrogated. R. at C-86.

[2] The spelling also appears as "Krippel" or "Kruppel" in parts of the record.

2

60. Assistant State's Attorney Lori[3] Levin, who ultimately took Mr. Hinton's statement, said that he never complained of mistreatment. *Id.* at 73.

Officers Bajenski and Kripple and Ms. Levin denied that Mr. Hinton was ever struck or threatened in their presence. *Id.* at 39, 54, 73. Ms. Levin also said that, when she came to take Mr. Hinton's statement, she asked him why he changed his mind, and Mr. Hinton said it was because he was scared before and wanted to tell the truth. *Id.* at 89.

Mr. Hinton's version of events differed dramatically from the State's witnesses. He testified that, over the course of the two days he was in custody, he was interrogated by several officers and an assistant state's attorney. Mr. Hinton said that, after he was arrested and taken to Area II, he was taken to a small room upstairs with no clocks, windows, or furniture, except for an iron bench. Supp. R. at 6-7. He was handcuffed by one arm to an iron ring in the wall. *Id.* at 7-8. Fifteen or twenty minutes later, two officers came in and began to interrogate him. The officer he identified as the "short one" told him to "start talking." *Id.* at 10. When Mr. Hinton said he didn't know what the officer was talking about, the other officer, later identified as the "tall one," said "I think he's lying. I think we'd better, you know, show

---

[3] The spelling of Ms. Levin's name also appears as "Laurie" in parts of the record.

him what we can do to you [sic]." *Id.* Then the tall officer started to hit Mr. Hinton in the face with an open hand, while he was still handcuffed to the wall. *Id.* The short officer kicked Mr. Hinton in the stomach, and the tall officer hit him in the face again and told him to talk. *Id.* at 11. Mr. Hinton said that he begged the officers to stop, but that they just asked if he was ready to talk about the murder. *Id.* at 12. The officers left and came back about a half hour later and talked to Mr. Hinton, this time without hitting him. *Id.* at 13-15.

Mr. Hinton said that, later, during another interrogation session, the same two officers showed him a gun, which they told him was the murder weapon, and asked if he was ready to talk. *Id.* at 16. After Mr. Hinton asked for a lawyer,[4] he says that one of the officers hit him on the elbow with the gun, then hit him under the chin. *Id.* at 17-18. The blow "busted" Mr. Hinton's chin and blood dripped on the jersey that he was wearing. *Id.* The officers left again, then returned and took Mr. Hinton to a line-up. *Id.* at 19. After the line-up, the officers brought Mr. Hinton back to the small windowless room and handcuffed him to the wall again. *Id.* at

---

[4] Mr. Hinton testified that he repeatedly asked for a lawyer, but that the officers continued to interrogate him without an attorney present. Although this may on its face state a claim for a Fifth Amendment violation, *see Miranda v. Arizona*, 384 U.S. 436 (1964), Mr. Hinton did not preserve that claim because he did not raise it in his petition for leave to appeal to the Illinois Supreme Court, so I do not consider it here. *See* 128 F. Supp. 2d at 1169-70.

4

20. The tall officer started hitting him again in the face with an open hand. *Id.* The short officer grabbed his free arm and pulled him away from the wall, and his handcuffed hand became numb. *Id.*

Mr. Hinton said that, after the first two officers left the room, a third officer questioned him and told him that he should start talking because the other officers would come back and they were bad and mean, and not as understanding as the third officer. Supp. R. at 22. Mr. Hinton said that he asked for a lawyer every time the officer questioned him about the murder case, and that the third officer left, saying that he could not get the information he wanted. *Id.* at 23.

A little while later, the first two officers returned, and the short officer was carrying a thick plastic trash bag in his hand. *Id.* at 23-24. The short officer put the plastic bag over Mr. Hinton's head, and the tall officer handcuffed both of his hands to the wall. *Id.* at 24-25. The short officer hit Mr. Hinton in the stomach while the bag was over his head, and Mr. Hinton struggled and eventually passed out. *Id.* at 25. When he came to, the tall officer was talking to him, and asked him if he was ready to talk. *Id.* at 25-26. Mr. Hinton said no, and the officers put the bag over his head again, but did not leave it on as long as the first time. *Id.* at 26. When the officers could not get Mr. Hinton to talk after the second bagging, they left the room.

About a half an hour later, Ms. Levin came in to see if Mr.

Hinton wanted to talk. Mr. Hinton told her that he had been beaten. When she asked him about the murder, he did not respond, and she left. *Id.* at 26-27. The two officers returned and beat Mr. Hinton again. *Id.* at 27. Ms. Levin returned and questioned Mr. Hinton for about ten minutes, but Mr. Hinton continued to deny any knowledge of the murders. *Id.* at 28.

All of this time (it is not clear from his testimony how much time had elapsed), Mr. Hinton said that he had not slept, had not eaten, and had not been allowed to use the washroom. He urinated on the floor of the room where he was handcuffed. *Id.* When the first two officers returned, they berated him for urinating on the floor and hit him, but left without questioning him. *Id.* at 30.

After a few hours, Lt. Burge came in and asked Mr. Hinton if he remembered him from a 1980 arrest. *Id.* at 31. He asked if Mr. Hinton was ready to talk about the murders, and Mr. Hinton again denied any knowledge of them. *Id.* at 32. Mr. Hinton testified that Lt. Burge asked him if he was familiar with the electric rod. *Id.* at 33. Lt. Burge told Mr. Hinton that he was "the same one that had the Wilson brothers," that the Wilson brothers had killed a police officer, and that he had gotten them to talk.[5] *Id.* Lt. Burge then told Mr. Hinton that, after he left, the state's attorney would

---

[5] Andrew and Jackie Wilson were interrogated at Area II on February 14, 1982. *People v. Wilson*, 506 N.E.2d 571, 572 (Ill. 1987). Andrew's confession was introduced at trial, and both were convicted of murder on February 4, 1983. *People v. Wilson*, 626 N.E.2d 1282, 1286 (Ill. App. Ct. 1993).

return, and Mr. Hinton would be sorry if he didn't talk to her. *Id.* at 34. Ms. Levin came back, but Mr. Hinton told her he had nothing to say. *Id.*

After Ms. Levin left, three new officers, whom Mr. Hinton had not yet seen, came into the room. Supp. R. at 34. They uncuffed Mr. Hinton from the wall, handcuffed his arms behind his back and led him from the small windowless room, down some stairs, to what Mr. Hinton said he thought was the basement.[6] They took him to a room and cuffed his hands over a pole above his head. One officer pulled down Mr. Hinton's pants and undershorts, spread his legs apart, and cuffed his ankles to poles in the floor. *Id.* at 37-38. Another officer came forward with a rod that was attached to a black box carried by the third officer. *Id.* at 38. The officers put a cloth in Mr. Hinton's mouth, then shocked him on the genitals with the rod. *Id.* at 39. Mr. Hinton described the pain as "[a] pain out of this world." *Id.*

The officers asked Mr. Hinton if he was ready to talk yet; Mr. Hinton did not say whether he answered this question, but testified that the officers shocked him twice more: one again on the genitals and once on his rectum. *Id.* at 40. When the officers removed the cloth from Mr. Hinton's mouth, Mr. Hinton told them that he was ready to talk, and that he told the officers he would tell them

---

[6] The State makes much of the fact that there was testimony that Area II has no basement. R. at 110.

what they wanted him to say. *Id.* The officers took off his cuffs and took him to talk to Lt. Burge. *Id.* at 41.

Mr. Hinton testified that Lt. Burge told him that he could have avoided the torture if he had claimed self-defense, and that Lt. Burge told Mr. Hinton to talk to Ms. Levin and to sign when she told him to. *Id.* Mr. Hinton was taken back to the first room with the iron bench, and Ms. Levin came in and asked if he had been treated well. *Id.* at 42. When Mr. Hinton told her that he had been beaten, she left and Lt. Burge returned. *Id.* Lt. Burge told Mr. Hinton to tell Ms. Levin whatever he wanted, but not to say that he had been beaten. *Id.* Ms. Levin returned with a stenographer and questioned Mr. Hinton about the murder, and Mr. Hinton testified that he "made up something." *Id.* at 43. Mr. Hinton signed the typed statement. *Id.* at 44.

On cross-examination, Mr. Hinton admitted that he did not think that he had any bruises as a result of his beating. *Id.* at 48-49. He also admitted that he made up "some of" the statement he gave to Ms. Levin. *Id.* at 67. Specifically, Mr. Hinton testified that Lt. Burge told him to say that one of the murder victims owed him $200. *Id.* at 68-69. Following up, the attorney for the state asked Mr. Hinton how much of the statement was made up. *Id.* at 66. Mr. Hinton's attorney objected on the grounds that the content of the statement was inadmissible for the purposes of the motion, but the court overruled the objection and allowed the testimony as

partial impeachment. *Id.* at 66-70. The state's attorney asked Mr Hinton "Didn't you say on direct examination you were never there and you made up the whole statement?" and Mr. Hinton's attorney objected that this mischaracterized his testimony. *Id.* at 69. In fact, all Mr. Hinton said on direct was that he "made up something." *Id.* at 43. Nevertheless, the court overruled the objection and when finally pressed with the question "you made the whole statement up?" Mr. Hinton responded "Yes, I did." *Id.* at 70.

Lt. Burge was called as a rebuttal witness, and he testified that he never beat or threatened Mr. Hinton. R. at 104. He also denied ever telling Mr. Hinton that he could tell Ms. Levin whatever he wanted as long as he did not say that he had been beaten. *Id.* Lt. Burge remembered very little about the encounter, but said "I don't recall the exact content of the conversation. I did walk into the room at one point and say hello, asked him if he remembered me." *Id.* at 107. He testified that, although he had talked with the other officers about the investigation, he did not have any conversation with Mr. Hinton about the investigation. *Id.* at 112-13. Lt. Burge also denied that there was a basement at Area II. *Id.* at 110.

After hearing brief argument, the court said "it's a credibility question, and based on what I have heard and the demeanor of the witnesses and the like, and the evidence presented, the Court hereby rules the motion to suppress [the] confession is

denied." R. at 115-16. Mr. Hinton waived a jury and testified at his bench trial. The state offered the testimony of Diana Staton, who testified that she heard five gunshots the night of the murder and saw Mr. Hinton leaving the house where the murders occurred, carrying a gun. *Id.* at 169, 172-73. Another witness for the State, David Dixon, testified that Mr. Hinton asked him if he could sell some guns in exchange for cocaine. *Id.* at 202, 207. Mr. Dixon said that Mr. Hinton told him that "he had to shoot a couple of people" because they owed him money. *Id.* at 211. The state also offered Mr. Hinton's confession, in which he admitted to the shootings. *Id.* at 236. He was convicted, and sentenced to life in prison without parole on September 13, 1985. *Id.* at 455.

After Mr. Hinton pursued an unsuccessful direct appeal, he filed a petition for post-conviction relief in state court, seeking an evidentiary hearing on new evidence of systematic torture at Area II under Lt. Burge's command. He presented the same evidence that is before me now: testimony and judicial opinions from the criminal trial and disciplinary hearings arising out of the Andrew Wilson case; a 1990 report by Michael Goldston and Francine Sanders of the Chicago Police Department Office of Professional Standards analyzing the history of allegations of abuse at Area II, particularly in the Andrew Wilson case, and concluding that there was "systematic torture" at Area II under the Command of Lt. Burge ("OPS Report"); a press release from the People's Law Office

("PLO"), a Chicago law firm, listing 63 cases of alleged police torture (including allegations of beating, electroshock, and "bagging"); and Mr. Hinton's affidavit, saying that he would not have testified at trial but for the denial of his motion to suppress.[7]

These documents detail other incidents of police brutality at Area II, some by or supervised by Lt. Burge. Many of the details of these cases are strikingly similar to Mr. Hinton's account: in *People v. Wilson*, the defendant was "punched, kicked smothered with a plastic bag, electrically shocked, and forced against a hot radiator" on February 14, 1982. 506 N.E.2d at 571. When Wilson was questioned by a state's attorney and mentioned the "mistreatment," the state's attorney told him to leave, and he was electrically shocked again by the officers. *Id.* Mr. Hinton's allegations are nearly identical, with the exception of the hot radiator. The OPS report (which is missing many pages in the post-conviction common law record attached to the habeas petition) identifies eleven other "bagging" victims, one of which was within one month of Mr. Hinton's arrest and interrogation.[8] R. at C-199. It also lists at

---

[7] I need not decide whether I am obligated to accept this affidavit at face value, for reasons I explain below.

[8] On October 29, 1983, Gregory Banks was handcuffed to a ring in an interrogation room at Area II, threatened with a gun, beaten with a flashlight, kicked in the stomach, and "bagged": a plastic bag was placed over his head and he was kicked in the stomach. *People v. Banks*, 549 N.E.2d 766, 767-68 (Ill. 1989).

least nine other victims of electrical shocking. *Id.* at C-202. The OPS report identified fifty alleged victims of misconduct, and Lt. Burge was named as accused in over fifty percent of the cases in which the accused could be identified. *Id.* at C-203. Lt. Burge was also named as an accused in eight of the nine electro-shocking cases. *Id.* Finally, the report identified Lt. Burge and Officer Bajenski as having been involved in Wilson's detention at Area II. *Id.* at C-206. The press release from the PLO identified ten incidents in the two years surrounding Mr. Hinton's arrest and interrogation in which either bagging or electro-shock was allegedly used, eight of which listed Lt. Burge as a participant or supervisor. *Id.* at C-93 to C-94.

The state court summarily denied Mr. Hinton's petition without an evidentiary hearing because the "tendered documents [did] not explain, with any degree of specificity, how the petitioner's constitutional rights were violated." R. at C-426. The Illinois Appellate Court affirmed, *People v. Hinton*, 706 N.E.2d 1017 (Ill. App. Ct. 1998), and the Illinois Supreme Court denied review, 712 N.E.2d 821 (Ill. 1999). Mr. Hinton filed this habeas petition before me on March 31, 2000.

## II.

Mr. Hinton claims that his confession was coerced by police torture and was therefore inadmissible. "A confession is 'involuntary' or 'coerced' if the 'totality of the circumstances'

demonstrates that the confessor did not make the decision to confess of his own free will." *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992). "It is axiomatic that a confession extracted with violence or the threat of violence is involuntary." *Id.; see also Brown v. Mississippi*, 297 U.S. 278, 285-87 (1936). Mr. Hinton's testimony at the suppression hearing, if it had been believed, would have established that he was tortured and that his confession was involuntary as a matter of law.

As an initial matter, there is some question as to the section under which to proceed. The parties both make their arguments under § 2254(d)(2), which requires Mr. Hinton to demonstrate that the adjudication of his involuntary confession claim "resulted in a decision that was based on an unreasonable determination of the facts *in light of the evidence presented in the state court proceeding*." (Emphasis added). By its plain language, § (d)(2) does not provide for review of factual determinations in light of new evidence. The new evidence here was not presented to the trial court because it was not available at the time of the suppression hearing, so § (d)(2) cannot provide a basis for review of the trial court's decision at the suppression hearing.

Section 2254(d)(1), however, provides for relief where the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

13

States." The trial court denied the motion because it did not believe that Mr. Hinton had been tortured, so it held implicitly that his confession was voluntary. Voluntariness is a mixed question of law and fact. *Lord v. Duckworth*, 29 F.3d 1216, 1221-22 (7th Cir. 1994). Mixed questions of law and fact are subject to review under § 2254(d)(1), *Williams v. Taylor*, 529 U.S. 362, 376 n.8 (2000) (plurality), but the state court's factual findings are entitled to a presumption of correctness under § 2254(e)(1). *Lord*, 29 F.3d at 1222. Mr. Hinton has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Williams v. Parke*, 133 F.3d 971, 973 (7th Cir. 1997). The factual determination challenged here is the trial court's determination, at the suppression hearing, that Mr. Hinton's testimony about torture was not credible.

Because the new evidence was presented to the state post-conviction court, § (d)(2) is the proper vehicle for review of its factual determination that the new evidence would not have changed the trial court's balance of the witnesses' credibility.[9] However, under either § (d)(1) or (2), the result here would be the same. If the new evidence shows by clear and convincing evidence that Mr.

---

[9] The state court also held, as a matter of Illinois law, that without evidence of an injury, the question of voluntariness boiled down to a head-to-head credibility contest between Mr. Hinton and the State's witnesses, and that the new evidence would be inadmissible because Mr. Hinton had no evidence of a physical injury. R. at C-426. I cannot review questions of Illinois law here. *Robertson v. Hanks*, 140 F.3d 707, 712 (7th Cir. 1998).

Hinton was credible and that he was tortured, then the trial court's determination that his confession was voluntary and admissible would be "an unreasonable application of," if not clearly "contrary to," clearly established federal law. *See Brown*, 297 U.S. at 285-86 (Convictions resting on confessions obtained by physical coercion violate the Due Process Clause. "The rack and torture chamber may not be substituted for the witness stand."). If the new evidence leads clearly and convincingly to the conclusion that Mr. Hinton was in fact tortured, the post-conviction court's factual determination (that the new evidence would not have changed the trial court's balance of the witnesses' credibility) would be unreasonable in light of the evidence presented. Either way, the critical question is whether Mr. Hinton is entitled to a hearing to develop the new evidence relating to his credibility and the credibility of the State's witnesses.

The State argues that a credibility determination is unreviewable, and cites *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). But credibility determinations, like any other issues of fact, are subject to rebuttal under § 2254(e)(1). *See Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000). *Lonberger* did not involve new evidence relating to credibility; instead, the Court of Appeals had merely

disagreed with the state's credibility determination. 459 U.S. at 430-33. *Cf. People v. Williams*, No. 97 C 2602, 1998 WL 60897, at *3 (N.D. Ill. Feb 4, 1998) (Moran, J.) (noting that petitioner had produced no new evidence that would lead court to reconsider trial court's assessment of credibility).

The State also argues that Mr. Hinton is not entitled to an evidentiary hearing under § 2254(e)(2), which requires an applicant to meet certain requirements if he "has failed to develop the factual basis of a claim in State court." On its face, however, § (e)(2) does not apply if the failure to develop a record in state court was not the petitioner's fault. *See Williams v. Taylor*, 529 U.S. 420, 432 (2000). Whether the petitioner is at fault for an undeveloped record is a question of diligence. *Id.* at 435. Diligence turns on "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue his claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

The State points to Mr. Hinton's failure to develop a record that would establish a physical injury, the absence of which the state courts found to be critical. However, the new evidence that Mr. Hinton seeks to introduce here is evidence that would reflect

16

on the credibility of Mr. Hinton and the State's witnesses. This evidence was not before the state trial court at his suppression hearing in 1985. The Wilson case, which brought to light similar allegations of police brutality and torture in Area II, was not decided by the Illinois Supreme Court until April of 1987. *See People v. Wilson*, 506 N.E.2d 571 (Ill. 1987). The OPS report was not authored until 1990, and the People's Law Office press release was not issued until 1992. The Police Board findings, suspending Lt. Burge for torturing Andrew Wilson, were not issued until 1993. Because none of this evidence was available to Mr. Hinton at the time of his suppression hearing, the failure to develop a record in the trial court was not his fault.

By the time Mr. Hinton filed his supplemental state post-conviction petition in 1996, however, the history of "systematic torture" at Area II under the command of Lt. Burge was well-known. He sought a hearing on this new evidence, but the state post-conviction court denied his petition without a hearing on the new evidence. Where, as here, the petitioner seeks a hearing, denial of a hearing by the state court means that the failure to develop the record is not the petitioner's fault and § 2254(e)(2) does not apply. *Williams*, 529 U.S. at 437; *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1090 (N.D. Ill. 1999) (Shadur, J.) (deciding case under *Burris v. Parke*, 116 F.3d 256 (7th Cir. 1997), which was approved by Supreme Court in *Williams*, 529 U.S. at 432).

17

Because § 2254(e)(2) does not apply, I decide whether to grant an evidentiary hearing under the pre-AEDPA cause and prejudice standard. *Williams*, 529 U.S. at 433. In *Williams*, the Supreme Court held that its recitation of counsel's efforts to obtain evidence was sufficient to establish cause. *Id.* at 444. The Seventh Circuit's definition of cause is "some objective factor *external* to the defense [that] impeded counsel's efforts." *Cawley v. DeTella*, 71 F.3d 691, 696 (7th Cir. 1995) (giving as examples of external objective impediments evidence that was not previously reasonably available or interference by state officials). Here the unavailability of the evidence for the suppression hearing in 1985 and the post-conviction court's denial of an evidentiary hearing were objective factors beyond Mr. Hinton's control.

In *Williams*, the Supreme Court held that the standard for determining prejudice was up to lower courts on remand. 529 U.S. at 444. "Prejudice" in the habeas context means "that had the [confession not been admitted], there is a reasonable probability that the verdict would have been different." *Padgett v. O'Sullivan*, 65 F.3d 72, 75 (7th Cir. 1995). The erroneous admission of an involuntary confession is a trial error, subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). "In a habeas proceeding, in order to determine whether a trial error was harmless we must determine whether, in the context of the record as a whole, the error '"had substantial and injurious effect or

18

influence in determining the jury's verdict"' which resulted in 'actual prejudice' to the defendant." *Jenkins v. Nelson*, 157 F.3d 485, 494 (7th Cir. 1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). "[W]here the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the admission of a coerced confession is not harmless. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).[10]

At Mr. Hinton's trial, the evidence tying him to the murders, other than his confession and his own testimony, which he says he would not have offered if his confession had been suppressed, consisted of the testimony of Diana Staton, David Dixon, and Officer Kripple. The State also offered "life and death" witnesses who testified that they knew the victims, two medical examiners, a ballistics expert and the police officer from the crime laboratory that examined the scene. None of the "life and death" witnesses tied Mr. Hinton to the murders.

Ms. Staton testified that, in the early morning hours of November 25th, she heard gunshots across the street from her house. She went to her window and saw Mr. Hinton leaving the house where the murders occurred carrying a gun. R. at 171. She said that the

---

[10] The Seventh Circuit has expressed doubt about, but has not resolved, whether the *Brecht* standard survived the passage of the AEDPA in 1996, or whether a stricter standard applies post-AEDPA. *See Denny v. Gudmanson*, 252 F.3d 896, 905 n.4 (7th Cir. 2001); *see also Whitehead v. Cowan*, 263 F.3d 708, 726 n.3 (7th Cir. 2001). I need not resolve this conflict, however, because the result here would be the same under either standard.

lighting was good, R. at 172, and that she was able to observe Mr. Hinton for two to three minutes as he ran away, *id.* at 174. She was able to describe what Mr. Hinton looked like and what he was wearing on the night of the murders, and she positively identified him in a line-up the day after the murders and again at trial. R. at 171, 173, 175.

Mr. Dixon[11] testified on direct that Mr. Hinton had come at about 1:00 a.m. on November 25th and asked Mr. Dixon to sell some guns for Mr. Hinton. *Id.* at 201-09. Mr. Dixon took the guns to James Randle[12] for Mr. Hinton and traded them for cocaine. *Id.* Mr. Dixon also testified that Mr. Hinton had told him that "he had gotten into a little trouble" and "had to shoot a couple of people." *Id.* at 210-11. Mr. Hinton told him that "he owed him some money or something. Was trying to rob him." *Id.* at 211. On cross-

---

[11] The record does not reflect how the police found out about Mr. Dixon. Ms. Levin testified that he was at the police station and had given a statement before Mr. Hinton confessed, R. at 260, 262, but the only other reference to Mr. Dixon at trial was in Mr. Hinton's confession. If Mr. Hinton's statements, even before his confession, were the source of information about Mr. Dixon, and if those statements were coerced, any evidence from Mr. Dixon might be inadmissible as "fruit of the poisonous tree." *See United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)) (holding that the government may not introduce evidence obtained through violations of the Fourth Amendment). However, Mr. Hinton has never argued that Mr. Dixon's testimony should be excluded on that basis, so he has waived any such argument here. *See id.* at 528 (holding that defendant has initial burden to establish link between Fourth Amendment violation and challenged evidence)

[12] The spelling also appears as "Randall" in parts of the record.

examination, Mr. Dixon admitted that the police had come to him with the story about the gun, saying that they wanted the gun. R. at 214. He also admitted that the police threatened to beat him up if he didn't cooperate, and that they grabbed at him. *Id.* He also admitted the police had threatened to charge him with murder if he didn't cooperate. *Id.* at 217-18. The police kept Mr. Dixon in custody for 72 hours. *Id.* at 218. Finally, Mr. Dixon denied that he had sold the gun identified as the murder weapon for Mr. Hinton. *Id.* at 219. However, Officer Kripple testified that James Randle (to whom Mr. Dixon testified he had given the guns from Mr. Hinton), while in custody at Area II on November 25th, made a phone call, after which an unidentified black male came to the Area II station and delivered the murder weapon. *Id.* at 326-28.

Mr. Hinton testified on his own behalf at trial. R. at 337-69. On direct, he told essentially the same version of his story that he did in his confession: that he went to John Durham's house to collect on a debt and got in a fight, that he struggled with Mr. Durham and that the gun went off. The only difference in the story was the nature of the debt; his confession said that Mr. Durham owed him $200, but at trial he explained that Mr. Durham really owed him an eighth of cocaine, which is worth approximately $200. *Id.* at 339-40, 363. On cross examination, Mr. Hinton admitted to lying to the police and Ms. Levin about his alibi and his knowledge of the murders when he was first detained. *Id.* at 356-59. The

state's attorney also asked Mr. Hinton if he had lied at the suppression hearing when he said that he was never at the scene of the murder.[13] *Id.* at 361. Mr. Hinton explained that the confession he gave to the police was true, except for the statement that John Durham owed him money, as opposed to cocaine. *Id.* at 363. Of course, what matters here is only Mr. Hinton's credibility; the truth or falsity of the confession is irrelevant to the question of whether it ought to have been suppressed. *See Rogers v. Richmond*, 365 U.S. 534, 544 (1961) (holding that the test of admissibility of confessions as voluntary is whether state officials' behavior overcame the defendant's will to resist and brought about a confession that was not freely self-determined, not the probable truth or falsity of confessions).

Mr. Hinton submitted an affidavit to the state post-conviction court, on which he continues to rely here, *see* Reply at 9, stating that he only testified as trial because his confession was admitted. He argues that the admission of his confession, and thus also his trial testimony, assuming it was an error, was not harmless error because, in his statement, he admitted to shooting one of the victims. *Id.* However, even if I accept Mr. Hinton's statement that he would not have testified, the evidence would have shown that he was at the house where the murders occurred, was seen

---

[13] As I have already noted, this line of questioning at the suppression hearing was a mischaracterization of Mr. Hinton's testimony on direct. *See* Supp. R. at 43, 67-70.

leaving the house carrying a gun after shots were fired, and that he sold two guns through Mr. Dixon that same night, after admitting that he had "gotten into a little trouble" and "had to shoot a couple of people." Mr. Dixon testified that he sold the guns to Mr. Randle, who made a phone call from the police station that led to the recovery of the murder weapon. Without Mr. Hinton's confession or trial testimony, there is no evidence about what happened in John Durham's kitchen that night, so there would have been no evidence of self-defense.

Mr. Hinton's confession and his trial testimony attempting to explain it were damning, but the remaining evidence against him, particularly his admission to Mr. Dixon that he had shot the victims, was so strong as to leave no doubt that the verdict was not substantially affected by the admission of his confession. *See O'Neal*, 513 U.S. at 437. Mr. Hinton argues that Mr. Dixon's testimony was not credible, but the credibility of a witness is a factual determination entitled to a presumption of correctness unless rebutted by clear and convincing evidence, which is not offered here. *See* 28 U.S.C. § 2254(e)(1); *Gibson v. Walls*, No. 01-2710, 2002 WL 730965, at *2 (7th Cir. Apr. 18, 2002) (unpublished order). Mr. Hinton also argues that Ms. Staton was not an eyewitness to the actual shootings, but she did see him leaving the scene of the murders immediately after the fatal shots were fired, carrying a gun and running away. Nothing in Mr. Hinton's defense

diminished the strength of this testimony, and even if it had, the trial court would have been entitled to convict on the basis of the positive identification. *See People v. Berland*, 385 N.E.2d 649, 658 (Ill. 1979) (affirming arson conviction based on two eyewitnesses who saw defendant entering scene of crime carrying gas can). He argues that, "[w]ithout the confession, her identification could have been questioned because she saw the man very briefly," Reply at 10, but his attorney *did* question her identification on cross examination and was unable to elicit any evidence that weakened her identification. R. at 178-99. Because Mr. Dixon's and Ms. Staton's testimony provided overwhelming evidence of Mr. Hinton's guilt, and because Mr. Hinton's confession to the police was cumulative of his confession to Mr. Dixon, the admission of his confession was harmless. *See United States v. Thompson*, 286 F.3d 950, 962 (7th Cir. 2002) (admission of statements harmless error where "the government presented overwhelming evidence of the defendants' guilt; [the erroneously admitted statements] were not very important to the government's case; and, to the extent the statements were important, they were cumulative"). Therefore he is not entitled to an evidentiary hearing to determine whether new evidence would show that his confession was the product of torture. His petition for habeas corpus is DENIED.

ENTER ORDER:

_____

**Elaine E. Bucklo**

24

United States District Judge

Dated:    May 21, 2002